We'll hear the next case, which is Continental Insurance v. Thorpe Insulation. Good morning, Your Honors, and may it please the Court. David Christian on behalf of Continental Insurance Company. May I reserve five minutes for rebuttal? You may, but you have to keep track of your own time because that's the whole time. Very well. Thank you, Your Honor. In this appeal, we ask that this Court vacate the order disallowing Continental's proof of claim in the Thorpe Insulation bankruptcy and remand to the Bankruptcy Court with instructions that the Bankruptcy Court compel arbitration according to the party's pre-petition arbitration agreements. In this case, in seeking to avoid the pre-petition arbitration agreements among the parties, the debtor seeks to characterize there as being a conflict between two federal statutes, the Federal Arbitration Act and the United States Bankruptcy Code. In fact, however, the Federal Arbitration Act and the Bankruptcy Code are in harmony here. There is no reason to expect that enforcing the party's pre-petition arbitration agreements would be in conflict with any provision of the Bankruptcy Code or Thorpe's reorganization. In fact, we know that to be the case here because, in hindsight, the plan that was ultimately confirmed is a plan that provides for payment of Continental's claim, if allowed, and whether or not it's resolved through arbitration or in front of some other tribunal. Is it your position that you are entitled to arbitrate and then receive the entire amount of whatever arbitration award you might receive from the bank? I'm sorry, I didn't mean to interrupt you, Your Honor. That's what the plan that was confirmed in this case provides. It need not have necessarily provided that. The precedents in this circuit recognize a distinction. Does it expressly refer to the arbitration? It expressly refers to the adjudication of our claim, yes, Your Honor. And that was a decision made, I presume, as a tactical matter by the plan proponents in order to take away any argument we might have about the treatment of our claim or the feasibility of the plan. That's the choice they made in this case. So we know on these facts. I'm sorry, Your Honor. I just am not quite sure. I'm not quite sure I understand what the status of that is in the bankruptcy because if it is a claim, then it would be paid. I thought that was your problem, one of your problems. It would be paid on a prorated basis. Well, actually, under the plan as confirmed, it would be paid better than pro rata. The plan provides for payment of $100. That we don't have a problem with. The claim, of course, has been disallowed. One of the orders on appeal is the order disallowing our claim on a summary judgment basis without an evidentiary record and without a trial. But our point is this. For purposes of this case, if the court directs an arbitration, we can go arbitrate. Whatever the arbitrator awards, the plan has been confirmed to provide for 100% payment of that claim in order to take those issues off the table from a plan confirmation standpoint. And so we know on the facts of this case, arbitration of our claim, notwithstanding the Chapter 11 case, can't possibly interfere with the debtor's reorganization. The debtor has confirmed a plan. That plan provides for payment of $100 of our claim if allowed. And the arbitration, what's more, can't interfere even in the sense of being a nuisance to the debtor because the debtor has already confirmed and substantially consummated a plan. So arbitrating now would be much like arbitrating prior to bankruptcy. In fact, forthnoting on the facts of this case, that had we been sent to arbitration when Continental first filed its motion to compel arbitration, we likely would have been done with fully adjudicating this claim long before the debtor ultimately confirmed a plan and long before the appellate process that's brought us before this court. It's one of the reasons that the jurisprudence recognizing and enforcing arbitration agreements in the context of Chapter 11 cases makes sense. Congress has written both these statutes, and Congress made the determination that it was appropriate to enforce the parties' pre-bankruptcy arbitration agreements. It's particularly salient here where the parties to the arbitration agreements are sophisticated parties that were well-represented and themselves contractually agreed that they desired to use arbitration as a more efficient and cost-effective vehicle. This case is a perfect illustration of the results that obtain when arbitration agreements are not enforced consistent with the Federal Arbitration Act. We end up with years of litigation, a long appellate process, and lots of lawyers spending lots of money. The Honorable Abraham Sofair had accepted jurisdiction prior to the petition date in this case. Indeed, Forbes' response to Judge Sofair's convening of an arbitration was due the day after it filed its Chapter 11 case. And so it's quite clear on these facts that arbitration would have been finished long ago, and our claim would have been handled however it was to be handled under the Chapter 11 plan. So Congress wrote both these statutes, and there's no reason to treat them as in conflict. Rather, on these facts at least, they can work in harmony. Moreover, refusing to enforce the arbitration agreements of the parties in this case dishonors multiple pre-petition settlements among these parties. In this case, Continental settled at least three times, has at least two mandatory arbitration agreements with the debtor, reached over multiple decades, and each time thought it was buying peace. In this case, we have a 1984 agreement. The so-called Wellington Agreement was entered into among these parties in 1985. Continental actually commenced an arbitration with Forbes in 1998, pursuant to the Wellington Agreement. That resulted in an award in Continental's favor. The parties then settled Forbes' appeal of that arbitration award in Continental's favor in a 2003 settlement agreement that was confirmed by a judgment of the Los Angeles Superior Court. In both the Wellington Agreement and in the 2003 settlement agreement, there are mandatory arbitration provisions that the parties have actually acted upon in the past. Judge Taufair, in accepting jurisdiction prior to the petition date in this case, was acting pursuant to his retention of jurisdiction over his earlier arbitration award and the settlement and judgment confirming that award in 2003. Simply put, the debtor in this case was using bankruptcy and the happenstance of bankruptcy for the windfall of being able to choose a more favorable forum. It's certainly true that in most every case, a debtor would prefer to litigate everything in front of the bankruptcy court, but Congress has made the decision that in general, unless a specific provision of the bankruptcy code requires a different result, that it prefers to let arbitration agreements stand and to enforce the parties' private arbitration agreements. You're suggesting though that there's somehow something nefarious or wrong in Thorpe and the debtor seeking rights under the bankruptcy court. And I don't see where this notion that somehow you were hoodwinked or that there's some impropriety in seeking bankruptcy protection and what flows from that is somehow thwarting your rights. Well, Your Honor, it's not necessarily that it's nefarious. I understand a debtor would just as soon litigate everything in front of the bankruptcy judge presiding over his case. But Congress has made the choice to enforce the parties' private arbitration agreements in the Federal Arbitration Act. And the law is clear in the circuit that where you have a non-court matter, and this is a non-court matter, it's a pre-petition state law contract dispute that could arise between parties without regard to any Chapter 11 proceeding. But you filed a claim in the bankruptcy. I'm glad you brought that up, Your Honor. In this case, we filed right out of the gate a motion to compel arbitration without filing a claim. The bankruptcy judge in the case said she couldn't decide whether there was any dispute to arbitrate until we filed a claim. And so she instructed us to file a claim. And then she said on our renewed motion to compel arbitration, she couldn't decide whether the dispute was one she should send to arbitration until the debtor objected to that claim. She wasn't sure the debtor would even contest the claim. But should we be concerned at all as to why you filed a claim? You just filed a claim. Well, Your Honor, if the court would refer to the citations to the record in pages 9 and 10 of our opening brief, we give you multiple illustrations of the bankruptcy court doing what she termed lulling us into submission. And so I think the court should be concerned that we were filing a claim only under compulsion of the bar date and only at the express direction of the court in a context where the bankruptcy court said she understood the reticence of a party who is actively seeking to arbitrate their claim outside the bankruptcy court and that that was not the purpose for which the bankruptcy court was directing that we file a claim. Rather, the bankruptcy judge indicated that she wanted to see whether the debtor would contest the claim and what the nature of the contest was in order to evaluate whether arbitration should be compelled. Can you remind me the issues that you were seeking to have arbitrated? Was it the issue of assignability, or I'm trying to recall, or was it the coverage questions? What was going to be arbitrated if you had successfully gotten it? We believe, and we had some basis in the record for our belief, that the debtor prior to bankruptcy, years prior to bankruptcy, had spent the time period from the 2003 settlement agreement until the 2007 bankruptcy filing working in concert and in contradiction of its obligations under our 2003 settlement agreement with those seeking to sue us and recover against us. Recall, Your Honor, that we had three different settlements with this debtor, and each time we thought we were buying some sort of peace. Apparently, we didn't succeed in getting peace, and what we sought to arbitrate was the actions taken in the four years prior to bankruptcy seeking to further claims by third parties. The settlement agreement was being subverted. Yes, correct, Your Honor. So this is an asbestos case. Yes, Your Honor. And the claims that you're concerned about are claims against Thorpe based upon asbestos issues. Alleged asbestos. Issues. And your gripe is, as I understand it, that Thorpe, after you had entered into a settlement, was sending more claimants to you to get paid rather than having to face them itself. But I guess addressing this in the big picture, why isn't the Bankruptcy Code's provision with respect to handling asbestos claims really supposed to trump all of this and make your claims with respect to arbitration and put this, as the Bankruptcy Court seemed to view it, as something within the proper jurisdiction of the Bankruptcy Court to resolve? Because, Your Honor, the issue is not the allowability or the procedures or the relief being requested by the debtor in seeking a discharge of his asbestos claims. The issue between us and Thorpe is a multi-decade series of agreements under state law that we sought to enforce. There are asbestos-related checkers. Yes, but they all relate to asbestos claims. Your Honor, if it were enough to say that it relates to asbestos claims, then the Bankruptcy Court's jurisdiction would be virtually unfettered. In every other asbestos-related Chapter 11 case, you have pre-petition settlements with releases that are enforced and honored. In the Quigley case in the Southern District of New York, Chief Judge Bernstein directed my client to go to arbitration about our issues with the debtor because he found it wasn't appropriate to litigate that in the Bankruptcy Court. And so in every other asbestos-related Chapter 11 case, you have situations where there are release carriers pre-petition. You have situations where pre-petition arbitration agreements are in place. I'm not intimately familiar with all this asbestos litigation. Thank goodness, I think, sometimes. But I thought that in those cases it was a done deal and that here we have this dispute that is continuing to fester that has to do with claims that are continually being made. And that just seems to me to give it a little different flavor, doesn't it? Judge Schroeder, I think you're mistaken in viewing those other asbestos-related cases as done deals. There's controversy. I guess there's never any done deals. Well, unfortunately, Continental is finding out that very fact. We thought we settled in 1984, 1985, and yet we're still at it. Counsel, Judge Gould with a comment. You earlier said you wanted to save five minutes for rebuttal. You're going to have just a couple of minutes if you stop now. I guess it's up to you. Thank you, Judge Gould. I will reserve it. We'll give you an extra minute. Thank you. Good morning, Your Honors. Daniel Bussell, Petition Bogdanoff and Stern on behalf of Thorpe Installation Appellee. May it please the Court. It's remarkable that Mr. Christian, through his entire argument, never really addressed Judge Seaborg's question. So what is it that you want to arbitrate about? What is your claim here? And I know the Court is confronted with a sprawling record with thousands and thousands of pages. If there is only one thing that you read in that record, it's tab 71, the amended proof of claim filed by Continental, where they state what their claim is. Now, Continental tells you it has nothing to do with bankruptcy. Bankruptcy is deferred. This is just pure state law, cause of action, private agreements, breach of garden variety, breach of contract. If you read the claim, however, it refers constantly to how they are being harmed by Thorpe pursuing 524G relief through the bankruptcy process. That's the substance of the claim. Indeed, when they invoked the jurisdiction, or tried to invoke the jurisdiction of the arbitrator, Mr. Sofair, they wrote a letter on October 2nd, 2007, before the Thorpe bankruptcy, saying, Mr. Sofair, please help us out. Thorpe is breaching their agreement. We want to come back for enforcement of our pre-bankruptcy settlement agreement. That document is attached as Exhibit F to the proof of claim. And if you read that document, the word bankruptcy appears in Continental's letter 35 times in a 10-page letter. And so the notion that their claim has nothing to do with 524G and nothing to do with bankruptcy is really spurious. Could you sort of play out for me, if this matter did go to Judge Sofair as the arbitrator and he rendered whatever decision he's going to render, how would that be contrary to the bankruptcy process? How would that impinge on the ability to proceed with the plan and the rest of it? Well, first of all, we're not in a position to sort of do a do-over here, where now four years later, after the plan is confirmed, we're just going to now evaluate what the nature of their claim was. Judge Blubond and Judge Fisher were faced with a claim that was made during the pendency of the bankruptcy case. And that claim, in its essence, asserted that pursuing this 524G relief breached this pre-bankruptcy settlement agreement and gave rise to a damage claim. And I submit to you, Your Honor, that that claim, it's the bankruptcy court that needs to make the call on that claim. It has to be the gatekeeper. Now, Mr. Christian says, well, Congress has said that the FAA trumps the United States Bankruptcy Code and that arbitration should be freely available in bankruptcy. And the truth is, over the last 30 years, we've developed a pretty extensive case law both in the bankruptcy courts and district courts, but even in the circuit courts. There are probably seven or eight circuit decisions in the last 15 years trying to adjust and reconcile the tension between the need of the bankruptcy court. Bankruptcy proceeding is a collective proceeding where they have all the parties in front of it. It's essential to the bankruptcy process that the disputes be centralized. That's the whole point. Bankruptcy is essentially a procedure, not a substantive statute, unlike some of the other federal statutes that you find arguably conflicting with the FAA. And so there have been different formulations about how the circuit courts have gone about trying to adjust this tension between the FAA, which says, we don't care about centralization. You arbitrate. The rest of you go to whatever courts you want to go to or arbitrators that you have agreed to. No centralization at all. And there are different formulations in the different circuits. And what I want to suggest to the court is you don't need to wade into that because under any of the formulations, even the strictest formulation, this kind of claim is not subject to arbitration. So what are the different? Because. Because what they would ask the arbitrator to do is to say, gee, pursuing this 524G relief is creating a damage claim. And whether or not what's going on in the bankruptcy is lawful or unlawful, whether it harms Continental or not, that's for Continental to bring in the bankruptcy court. If they are harmed in the bankruptcy, let them make their argument to the bankruptcy judge. Well, but they say their harm is not caused by the bankruptcy. It's caused by the conduct. That is not what their claim says. Read the claim. The claim refers to CAPT plan. That's our plan, the 524G plan. And CAPT trust, which is our 524G trust, 26 times in the course of stating what their claim is. Now, it is true that there are two paragraphs in that claim that you could sever out and say, oh, they relate solely to these three Brayton Purcell direct action claims that were commenced in September of 2007 prior to the bankruptcy. And the first time this matter was before Judge Fisher, she focused on that. She said, you know, I'm looking at what is for you, tab 71, in her record. I don't know what the reference would have been. And I'm reading it very carefully. And it's true that most of what they're complaining about is what the plan does to them and what the trust does to them. But what about paragraphs 23 and 24? And so I'm affirming on all the grounds except go back and the bankruptcy court now has to make findings with respect to paragraph 23 and paragraph 24, the so-called direct action claims. And when that claim was remanded back to the bankruptcy court, Clinton Hill took the position, we don't want to argue about that. Well, I understand why they didn't want to argue about that. Three direct actions that were on file for three weeks before the bankruptcy in the context of a $600 million asbestos case is not a meaningful claim. So it's perfectly clear to me why they didn't want to argue about it. Judge Blubin said, well, do you want a trial? Do you want discovery in a trial directed to paragraph 23 and paragraph 24? And they said no. And she said, do you want it? Are you sure? And they said no. And they said no three times. And after the third time, they said, okay, now I understand. Your claim is what it always has been. It is that this process is causing you harm. That is not a claim that should be arbitrated. And by the way, that is a claim that is preempted or precluded by the bankruptcy code. Why is it precluded by the bankruptcy code? Because what you're asking is in a pre-petition private agreement between two parties to waive this access to this collective right, 524G, which provides the only mechanism to globally settle asbestos claims. Let's talk Mr. Christiansen. Well, you know, we've been settling with them for 30 years. And the reason that that's so is that asbestos is unique in that it has this very long latency period. And so you can settle with your insured pre-bankruptcy. But what you can't settle and what Continental did not settle and does not, if you press them, claim that they settled, were the direct action rights and the contribution claims of third parties. There were a lot of third party rights. So what happens under this plan that Continental abhors? Pre-bankruptcy, there was a settlement and a release of Thorpe's coverage claims against Continental. Those claims are not revived by the plan. Those claims are released. They're not vested in the trust. They're not part of the asbestos insurance rights that are transferred to the trust and pursuant to the plan. What is still open are the direct action rights of third parties to pursue Continental and the contribution claims of the settling insurers who contributed to the trust and funded the trust. And as part of that, the contribution claims that they had, because they were co-liable with Continental on this risk, are transferred into the trust that's now going to be asserting whatever remaining asbestos insurance rights exist. And so if you look before and after, before Continental, no liability to Thorpe, exposed to direct actions from individual asbestos claimants and exposed to contribution claims from their co-liable insurers. After the plan, exactly the same. Claims that were released are not revived. If anything, Continental is in a better position because now there's a kind of marshalling going on such that the direct action claimants have to queue up and get consent from the trust before pursuing. Part of their claim that you're fomenting the direct action claims against them? We're neutral as to the... Let's step back for a minute outside of the asbestos context. In bankruptcy, it is a fundamental principle of bankruptcy law. Certainly in this circuit, the authority is very clear. Under 524E, the discharge of a debtor does not release third-party claims. If third parties have direct rights against non-bankrupt parties, through the plan process, those ordinarily can't be cut off. That's the starting position. 524G is a special exception to that general principle. Ordinarily, you can't affect third-party rights in bankruptcy. The reason 524G is so attractive is it is the only mechanism that exists to really buy a global piece because there, through the 524G exception, you can cut off these third-party rights. And so really what Continental is saying fundamentally is, look, what we want is 524G relief without paying for it. We're not going to contribute to your trust, but we want the same protection from those direct action claims and those indirect contribution claims that all your settling insurers are getting through the plan. We don't want the plan to be neutral as to our pre-bankruptcy rights. We want a complete and total release. And because you promised in this 2003 agreement to give us a global release, you are now contractually obligated to deliver that by only proposing a plan that we like that puts us in the position of a settling insurer, even though we do not qualify for 524G relief because the statute is for the protection of the claimants. It's for the protection of insurers. The statute requires the consent of the asbestos creditors before that 524G global release is put into effect. The statute requires that there be a contribution that is fair and equitable to the trust as the price of that relief. Continental isn't paying that price. With respect to the arbitration issue, again, there are different circuit decisions out there. There are actually two of the seven recent appellate decisions, reconciling, bankruptcy code, and arbitration, that actually arise in the context of asbestos litigation. And so I would point the court to those two decisions. National GIPSOM and U.S. Lines. And in both of those cases, what you see is non-settling insurers who are attempting to assert claims against 524G debtors. And in both of those cases, the Second Circuit and U.S. Lines and the Fifth Circuit and National GIPSOM reconcile the conflict by saying, This is a matter for the bankruptcy judge to decide. Even taking into account strong policy in favor of arbitration embodied in the Federal Arbitration Act. Let me take you back to Judge Seaborg's question. If they had not filed a claim in bankruptcy, then how would this have played out? Well, in fact, they did file a claim. If they hadn't filed a claim, the claim would have been subject to discharge. And so it would have been of no value. And so it wouldn't have been an issue with respect to the reorganization. It would have simply been discharged. There was a bar date. The bankruptcy court fixed the bar date. And so anybody who had a claim had to make the claim. Now, there's this argument in their papers, and again Mr. Christian alluded to it at the podium, that, oh, this is fundamentally a non-core action. And it's hard for me to believe that here I am in the Ninth Circuit after 25 years of bankruptcy practice facing an argument that the allowance or disallowance of a claim against the bankruptcy estate is not a core matter. The statute could not be clearer that that is a core matter. The authorities could not be clearer that that is a core matter. And so the notion that it is based on state-created rights, that's always true. Every claim, every contract claim, the process is you file a claim. It is then adjudicated in the bankruptcy court. That's part of this centralization of dispute. What is your response to the contention here that, well, the bankruptcy court has taken into account the possibility of the arbitration and provided for its being paid? Well, the bankruptcy court said this shall not be arbitrated. This claim shall be adjudicated. And the claim is treated upon its final – if this court were to determine, for example, that the disallowance of the claim was improper and remanded it and ultimately the claim was allowed in a certain amount, then that claim would be deemed unimpaired and would be paid. Right, so it's a contingent. Right, but it never was premised on it going to arbitration. Right. It was premised on the result of the adjudication. Adjudication. Yeah. Thank you. One more question. Are there any questions, Judge Wold? I do have one more question for you. The argument that their hand was forced with respect to filing the claim, is that something we should take into account? No, I think you can read Benador v. Conejo, which is the Ninth Circuit decision that's cited in the papers, which is, I think, very clear on the point, that it was completely appropriate for the bankruptcy court to take this wait-and-see attitude. And then once the claim is filed, as you indicated, it doesn't matter why you filed it, it is now part of the administrative allowance of claims against the estate that is part and parcel of the bankruptcy court.  And Judge Wold, did you have a question, sir? I did not. No, thanks. All right. Thank you. Thank you. First of all, Mr. Bussell completely mischaracterizes the nature of the claim we made. Let's think about that for a moment. We've never said that we're trying to object to the debtor's invocation of Section 524G in the context of our claim, nor could we have. The arbitration was commenced prior to the bankruptcy filing, and we know on the record in this case that the debtor asserted, and the bankruptcy court found that at the time it filed bankruptcy, it had not begun work on its Chapter 11 plan. That was the basis for entering a preliminary injunction against the coverage litigation for nine serial injunctions throughout the pendency over three years of this bankruptcy case, that the debtor had to focus on crafting a plan that it hadn't yet formulated, that this was not a prepackaged bankruptcy. And so the conduct we're complaining of in the time period from 2003 until 2007 when the debtor filed bankruptcy could not on this record have related to the Chapter 11 case or the formulation of a plan. Now, when we filed our amended claim, did we cover the waterfront? I mean, once under compulsion of the bankruptcy court to assert all claims that we might have, did we make mention of what we objected to about the plan and the plan objections that we ultimately pursued in the bankruptcy court? Well, for sure we did. But the arbitration in question, the issue before this court, is whether the bankruptcy court should have compelled arbitration when we first sought it before ever filing a claim at the outset of the case when Judge Sofair had accepted jurisdiction and directed a response from Thorpe about the alleged breaches prior to commencement of bankruptcy. And on this record we know prior to the formulation of any Chapter 11 plan. The idea that the debtor's conduct in 2003 somehow related to the formulation of this Chapter 11 plan, confirmed many years later, is hard to credit. Not only because of the record that the debtor hadn't yet formulated its plan when it filed bankruptcy, but because the debtor had different lawyers. In order to pursue the bankruptcy strategy, the debtor ended up obtaining multiple different law firms. None of them were representing the debtor when the conduct we complain of began. And so it's just not credible and not consistent with this record to suggest that the claim we sought to arbitrate at the outset of the bankruptcy was about the debtor's indication of Section 524G. We couldn't know whether the debtor would invoke Section 524G. Let me also... once bankruptcy is up and running, it's a different problem at that point. So the fact that it wasn't contemplated in 2003 doesn't mean that the issue doesn't change to some... or perhaps changes in terms of how it's perceived once the bankruptcy process is up and running. Judge Seaborg, this Court's precedent recognizes a distinction between adjudication under state law of state law non-court claims and the allowance and disallowance process in bankruptcy court. And so we encourage the Court to draw that distinction here. Moreover, we would have been done with our arbitration prior to... long prior to confirmation of the plan in this case if arbitration had been compelled at the outset. I see my time's expired, so unless the Court has questions, I'll sit down. Further questions? No questions here. Thank you. Thank you. The matter just argued is... submitted for decision.
judges: Seeborg, Schroeder, Gould